## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

)
)
**WALTER TUVELL,**                                    )
)
**Plaintiff,**                             )
)
**v.**                                  )
)                      **Civil Action No. 13-11292-DJC**
)
**INTERNATIONAL BUSINESS MACHINES,**   )
**INC.,**                                             )
)
**Defendant.**                          )
)
)
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                            **July 6, 2015**

### I.      Introduction

Plaintiff Walter Tuvell ("Tuvell") filed this lawsuit against Defendant International

Business Machines, Inc. ("IBM") alleging that he was unlawfully terminated as a result of

discrimination and retaliation in violation of the Americans with Disabilities Act (the "ADA"),

42 U.S.C. §§ 12101 *et seq.*, and Mass. Gen. L. c. 151B, §§ 4(1), 4(16), 4(4) and 4(5).  D. 10.

IBM has moved for summary judgment.  D. 73.  For the reasons stated below, the Court

ALLOWS the motion.

### II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material

fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect

the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless

Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.

1996)).   The movant bears the burden of demonstrating the absence of a genuine issue of

material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477

U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the

allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986), but "must, with respect to each issue on which she would bear the burden of proof at

trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  Borges ex

rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).   "As a general rule, that requires

the production of evidence that is 'significant[ly] probative.'"  Id. (quoting Anderson, 477 U.S.

at 249) (alteration in original).  The Court "view[s] the record in the light most favorable to the

nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20,

25 (1st Cir. 2009).

## III.    Factual Background

The facts are as represented in IBM's statement of material facts, D. 74, and undisputed

by Tuvell, D. 82, unless otherwise noted.

Tuvell is a white male, born in 1947, who claims to suffer from post-traumatic stress

disorder ("PTSD")[1] stemming from an incident in 1997 when he was allegedly offered a job with

the Microsoft Corporation ("Microsoft"), which was subsequently rescinded.  D. 82 ¶¶ 1, 2.

On November 3, 2010, Tuvell was hired by Netezza Corporation ("Netezza") in the

Performance Architecture Group.  Id. ¶ 4.  In this position, Tuvell reported directly to Daniel

Feldman and reported "on a dotted line" to Fritz Knabe.  Id.  IBM subsequently acquired

---

[1] For the purposes of this motion, IBM does not challenge Tuvell's claimed disability.  D.
75 at 4 n.3.

2

Netezza, and Tuvell, Feldman and Knabe became IBM employees.  Id. ¶ 5.  Until May 2011, Tuvell worked with Feldman and Knabe without any notable conflicts.  Id. ¶ 6.

### A.  Tuvell's Conflicts with Supervisors at IBM

In the spring of 2011, however, Tuvell and Knabe's professional relationship began to deteriorate.  Id. ¶¶ 6, 8-9.  On May 18, 2011, Feldman reported to Tuvell that Knabe had expressed concern that Tuvell had not completed a work assignment on time.  Id. ¶ 7.  Then, on June 8, 2011, Knabe asked Tuvell about an outstanding assignment in front of several other employees.  Id. ¶ 8.  During this conversation, both Tuvell and Knabe were heard to raise their voices.  Id.  Seemingly as a result of these two incidents, on June 10, 2011, Feldman told Tuvell that he did not believe that Knabe and Tuvell could continue to work together effectively.  Id. ¶ 9.  Feldman subsequently switched Tuvell to a different project and, in turn, assigned another employee, Sujatha Mizar, who is Asian, female and younger than Tuvell, to work with Knabe. Id. ¶¶ 10-12.  This transfer did not result in any change to Tuvell's pay or his rank within the company.  Id. ¶¶ 10-11.  Nevertheless, Tuvell contends that Knabe's conversation with Feldman on May 18, 2011 constituted discrimination based on age, sex and race.  Id.

On June 14, 2011, Feldman sent Mizar and Tuvell an email asking for daily status reports detailing the transition tasks completed and raising any issues with regard to the shift in responsibilities.  Id. ¶ 14 (citing Transition of Responsibilities Email, D. 76-19).  Mizar replied to the email with a brief status update, copying Tuvell and adding that Tuvell should "feel free to add anything" that Mizar "might have forgotten."  Id. (quoting Transition of Responsibilities Email, Tuvell Exh. 58).  The next day, Feldman clarified that he expected a separate status report from both Tuvell and Mizar.  Id.  In response, Tuvell sent an email to Feldman, copying Human Resources Specialists Kelli-ann McCabe and Diane Adams, complaining that the request to

3

provide separate status reports was "blatant" and "snide harassment/retaliation."   Id.   ¶ 15
(quoting Transition of Responsibilities Email, D. 76-19).   Tuvell further complained that
Feldman had "unilaterally forced an adverse job action upon [Tuvell]" and that the transition
constituted "a prima facie case (and even stronger) for discrimination on the grounds of both age
and sex, and perhaps even race."  D. 76-19 at 1-2.  On June 16, 2011, Tuvell sent additional
emails to Adams and McCabe complaining of harassment by Feldman based on Feldman's
decision to switch Tuvell's assignment.  D. 82 ¶ 16.  Tuvell told Adams and McCabe that he
believed it was "infeasible" for him to work with Feldman.  Id.

That same day, Adams forwarded Tuvell's email regarding Feldman to a Senior Case
Manager in IBM's Human Resources Department, Lisa Due.  Id. ¶ 17.  Due then conducted an
investigation into the situation, interviewing five individuals, including Tuvell.  Id.  In his
interview with Due, Tuvell described his experience with Feldman and Knabe as the equivalent
of "torture" and "rape."  Id.  On June 29, 2011, Due informed Tuvell of the results of her
investigation and her conclusion that his concerns were not supported.  Id. ¶ 19.  Due further
informed Tuvell of his appeal rights if he was dissatisfied with Due's findings.  Id.  Based upon
Due's findings, IBM decided not to transfer Tuvell to another supervisor.  Id. ¶ 18.

In July 2011, Tuvell took medical leave for elective surgery followed by vacation.  Id. ¶
20; D. 76-1 at 6 (clarifying date).  Before taking leave, Tuvell sent an email to Feldman and
another colleague notifying them that he had completed an assignment regarding a wiki page.  D.
76-22 at 3.  In the email, Tuvell explained that the update could be found by searching the wiki
but he also attached the link, adding "if you're lazy you can just click this link."  Id.  Feldman
thanked Tuvell for the work but informed Tuvell that his communication style was "the sort of
thing that you want to avoid."  Id. at 2.  Tuvell apologized for his use of the word "lazy" and said

that he would "search harder for less ambiguous/offensive wording." Id. at 1.  On July 20, 2011,

Tuvell sent a second email explaining that "laziness is lauded as a prime virtue of programmers,"

concluding that "[o]bviously no apology was necessary." Id. at 4.  Tuvell then apologized for

the apology. Id.  When Tuvell returned from leave on August 3, 2011, Feldman met with him to

discuss pending and future projects.  D. 82 ¶ 24.  At this meeting, Feldman also talked with

Tuvell about the series of emails, which Feldman considered to be inappropriate, and gave

Tuvell a warning letter.   Id. ¶ 25.   The letter instructed Tuvell to "[i]mmediately cease"

"unprofessional, disrespectful, demeaning, disrupted, offensive or rude" behavior and

specifically mentioned Tuvell's July 20, 2011 email.  D. 76-11.

### B. Tuvell's Short Term Disability Leave, Internal Complaints and Accommodation Requests

On August 11, 2011, Tuvell told Kathleen Dean, a nurse in IBM's Medical Department,

that he wanted to apply for Short Term Disability ("STD") because of a "sudden condition."

D. 82 ¶ 26.   Dean provided Tuvell with information on how to apply for STD leave and, on

August 15, 2011, Tuvell notified Feldman that he would be taking sick days until his STD

request was processed.   Id.   Tuvell simultaneously submitted a Medical Treatment Report

("MTR"), indicating that he was suffering from a "sleep disorder and stress reaction." Id. ¶ 32.

Tuvell represented that due to his medical condition he was not "able to function at his job

responsibilities."   D. 76-38 at 1.   The MTR further indicated that Tuvell "suffered severe

impairment in his ability to manage conflicts with others, get along well with others without

behavioral extremes, and interact and actively participate in group activities" and "suffered

serious impairment in his ability to maintain attention, concentrate on a specific task and

complete it in a timely manner, set realistic goals, and have good autonomous judgment."  D. 82

¶ 33.  IBM approved Tuvell's STD leave on August 17, 2011.  Id. ¶ 34.  While Tuvell was out on medical leave, IBM restricted his access to the company's internet and facilities.  Id. ¶ 53.

On August 18, 2011, Tuvell filed a "Corporate Open Door Complaint" entitled "Claims of Corporate and Legal Misconduct."   Id. ¶ 27.  The first part of the complaint was titled "Acts of Frtiz Knabe" and was 129 pages, including 22 pages written by Tuvell and 107 pages of supporting materials.  Id.  The second part was titled "Acts of Dan Feldman" and included 31 pages of allegations, plus 122 pages of supporting documents.  Id.  Tuvell acknowledges that he spent 22 hours a day over the course of 2-3 weeks on these complaints.  Id. ¶ 28.

A week later, on August 25, 2011, Tuvell complained that IBM had not finalized its investigation of his Open Door Complaint.  Id. ¶ 29.  On September 15, 2011, the Program Director for IBM's Concerns and Appeals, Russell Mandel, completed a version of the investigation report.  Id.  Based upon his interviews with nine people, including Tuvell, Mandel concluded that Tuvell had not been subject to any adverse employment actions.  D. 88-2 at 19 (Mandel Investigative Report).

Tuvell submitted a second MTR on September 9, 2011, indicating that he was "totally impaired for work."  D. 82 ¶ 35.  Upon receiving the second MTR, Dean contacted Tuvell and informed him that given the nature of his diagnosis for a sleep disorder and stress reaction, the MTR form must be completed by a specialist.   Id. ¶ 36.  Tuvell responded that his "family physician is fully competent to diagnose [his disorder]."  D. 76-16 at 5.  Tuvell added that, if necessary, it would take time to get a psychotherapist and that he would "be forced to enter an abusive situation" if he had to return to work as his condition was a direct result of Feldman's "direct abusive psychological attack."  Id.  Dean agreed to accept the MTR completed by his physician for one month.  D. 82 ¶ 36.  Dean was subsequently informed by Dr. Stewart Snyder,

the Physician Program Manager of IBM's Integrated Health Services, that for psychological disorders IBM policy required the MTR forms to be completed by a psychiatrist if the employee is out for more than six weeks "because if a person is ill enough that they can't work for that long then they have exceeded the expertise level of a family physician to deal with their mental illness." Id. ¶ 37. Dean contacted Tuvell and told him "that in the interest of ensuring that he was receiving proper care, IBM required a psychiatrist to complete his MTR" if he remained out for another month. Id. ¶ 38. Tuvell responded that there was nothing that a psychiatrist could do to "help" him because there was nothing "wrong" with him and emphasized that the only reason that he was out on STD was because of the abuse he faced at work. Id. ¶ 39. Tuvell added that IBM's handling of his complaints was "intentionally psychologically abusive." Id. Dean subsequently informed Tuvell that IBM would accept a MTR from his Licensed Social Worker, Stephanie Ross, who was providing him psychotherapy. Id. ¶¶ 36, 40, 41. Tuvell then provided IBM with MTRs completed by Ross for October and November of 2011. Id. ¶ 41. These MTRs all indicated that Tuvell was totally impaired for work. Id.

Ross's October MTR indicated that Tuvell suffered from "ongoing acute stress symptoms especially regarding the perception of retaliation following sudden demotion without cause, disruption of sleep, eating, symptoms of helplessness and anxiety," id. ¶ 42 (quoting October MTR, D. 76-26 at 1), and noted that Tuvell had "serious impairment in getting along with others without behavioral extremes and initiating social contacts, negotiating, and compromising." Id. Tuvell acknowledges that, at around this time, he stopped at a gas station near a work facility and that simply being that close to the building "triggered" a "blow up." Id. ¶ 43.

Ross's November MTR listed, for the first time, Tuvell's diagnosis as PTSD and indicated that Tuvell was still totally impaired for work. Id. ¶ 44. The MTR also noted that

Tuvell continued to have serious impairment "getting along well with others without behavioral extremes, initiating social contacts, negotiation and compromise, and interaction and active participation in group activities, and continued to have serious impairment as well with respect to managing conflict with others, negotiating, compromise, setting realistic goals, and having good autonomous judgment." Id.  Ross noted that "any contact with people from work, any discussion about work, going anywhere near the work facility at that time was a circumstance in which [Tuvell] was triggered into a state that involved hyper-reactivity, hyper-arousal" and that Tuvell "had a significant amount of obsessive thinking."  Id. ¶ 45 (quoting Ross Depo., D. 76-7 at 11). Ross further noted that Tuvell would become "extremely upset," "had trouble speaking" and would cry and shake when talking about work.  D. 76-7 at 10.  Ross was concerned for Tuvell's "mental health stability and believed that just going into the building where he worked and seeing [] Feldman or [] Knabe could trigger his obsessive thoughts, depression, or other strong reactions." D. 82 ¶ 46.

In early November, while Tuvell was out on medical leave, his counsel wrote to Mandel identifying PTSD as a disability and requesting a reasonable accommodation.  Id. ¶ 30. Specifically, Tuvell's counsel requested that Tuvell no longer be required to report to Feldman. Id.  IBM subsequently informed Tuvell that it did not consider reassignment to another management team to be a reasonable accommodation but indicated that it was receptive to other proposals for possible accommodations.  Id. ¶ 31.  IBM also noted that Tuvell was free to look for open positions using IBM's Global Opportunity Marketplace ("GOM").  Id.

In December 2011, Tuvell submitted another MTR completed by Ross, which indicated that he was "unable to return to previous setting with [his] current supervisor and setting – PTSD symptoms exacerbate immediately."  Id. ¶ 47.  Ross indicated that Tuvell had serious impairment

"getting along well with others without behavioral extremes, initiating social contacts, negotiating and compromising, interacting and actively participating in group activities, managing conflicts with others, and setting realistic goals and having good autonomous judgment."  Id. ¶ 48.  Ross also noted that the "only modification that would be possible is a change of supervisor and setting."  Id. ¶ 49.  Ross explained that around that time Tuvell could not "drive within a 50 mile radius – 20 mile radius of where he worked for a period of time without becoming hysterical."  Id. ¶ 52.

### C.   Tuvell Applies for Another Position within IBM

On December 8, 2011, Tuvell interviewed for an open position in another IBM facility. Id. ¶ 57.  Despite having submitted MTRs indicating that he was "totally disabled," Tuvell told the interviewer, Christopher Kime, that he had a "completely clean bill of health."  Id.  On January 6, 2012, Kime emailed Tuvell and told him that he would not be offering him the open position.  Id. ¶ 64.  Kime explained that he had "underestimated the difficulty of moving forward with bringing [Tuvell] to the team" and that he could not "move forward with taking [Tuvell] directly from being on short term disability."[2]  Id. at 38 (quoting, Kime Email, Tuvell Exh. 64). Kime added that "[g]iven the current needs of our group" there was "concern about the work being to [Tuvell's] liking and keeping [Tuvell] as a productive and satisfied member of the team."  Id. ¶ 64.

Tuvell subsequently emailed Feldman accusing IBM of retaliation based upon his failure to receive an offer for the open position.  Id. ¶ 66.  Feldman responded offering Tuvell a variety of other options, including receiving performance feedback from another supervisor, leaving

---

[2] IBM contends that Kime was not aware when he initially interviewed Tuvell that the fact that Tuvell was on short term disability leave prevented Kime from providing a performance review to management for an assessment of his qualifications and work performance.  D. 82 ¶¶ 63-64.

work as necessary to seek medical attention and continued access to GOM to look for open positions. Id. ¶ 67. Tuvell rejected these proposals and, on January 23, 2012, Tuvell's counsel requested as a reasonable accommodation that IBM transfer Tuvell to Kime's open position, which had been reposted after the posting had expired. Id. ¶ 68. IBM denied Tuvell's request for reassignment. Id. ¶ 69. IBM reiterated its proposal that Tuvell receive all feedback from a different manager. Id. Tuvell reapplied for the reposted Kime position, but was not considered for the position. Id. ¶ 70.

### D.  Tuvell's Employment with Another Company and Termination from IBM

On January 25, 2012, Tuvell exhausted his STD benefits but remained on unpaid medical leave. Id. ¶ 55. On February 15, 2012, Feldman's supervisor, John Metzger, contacted Tuvell directly and offered to give Tuvell all of his performance evaluations personally. Id. ¶ 71. Tuvell rejected Metzer's proposal, indicating that he was medically incapable of returning to work under Feldman. Id. ¶ 72. Around this time, unbeknownst to IBM, Tuvell was interviewing for a full time position with another company, Imprivata, which develops and sells software products. Id. ¶¶ 73, 80. On February 28, 2012, Imprivata made an offer to Tuvell and, on March 12, 2012, Tuvell started working for the software company while still on medical leave from IBM. Id. ¶ 73. Tuvell's salary at Imprivata is higher than his salary at IBM. Id. ¶ 81.

On April 25, 2012, IBM learned that Tuvell's Long Term Disability ("LTD") benefits had been denied. Id. ¶ 56. IBM informed Tuvell that he could remain on unpaid leave pending his appeal of the denial. Id.

In May 2012, Human Resources Specialist Adams became aware that Tuvell's LinkedIn page listed another company, EMC, as his current employer. Id. ¶¶ 15, 76. Adams wrote Tuvell asking him to confirm that he was not working for EMC. Id. ¶ 74. Adams notified Tuvell that

working for EMC would be a violation of IBM guidelines and that, if true, he would be terminated.  D. 10 ¶ 134.  Tuvell then accused IBM of defamation, arguing that he was not violating any guidelines.  D. 82 ¶ 74.  Adams responded that Tuvell's LinkedIn page listed EMC and asked him again to confirm that he was not working for EMC.  Id. ¶ 76.  Tuvell indicated that he was not working for EMC and that continuing to ask him if he was working for them was harassment and defamation.  Id. ¶ 77.  Tuvell refused to respond to further inquiries about where he had been working during his leave.  Id.  On May 15, 2012, Adams wrote to Tuvell that he should "advise IBM where you are currently working by 5pm tomorrow."  Id. ¶ 78; Adams Email, Tuvell Exh. 89.  Adams explained that "IBM ha[d] been attempting for approximately the past two weeks to find out if you are engaged in competitive employment" and that "IBM employees may not work for a competitor in any capacity without obtaining consent."  Adams Email, Tuvell Exh. 89.  Tuvell refused to provide IBM with his work information.  D. 82 ¶ 79.  On May 17, 2012, IBM terminated Tuvell.  Id.

## IV.    Procedural History

Tuvell instituted this action on April 24, 2013 in the Middlesex Superior Court.   D. 1.  IBM subsequently removed the action to this Court, id., and Tuvell filed an amended complaint.  D. 10.  Plaintiff seeks recovery for failure to engage in interactive process (Count I); failure to reasonably accommodate (Count II); failure to assist plaintiff in obtaining reasonable accommodation (Count III); failure to reassign as reasonable accommodation (Count IV); failure to reassign due to discriminatory/retaliatory purpose (Count V); numerous adverse tangible job actions due to discrimination and/or retaliation (Count VI); harassment based on discrimination and/or retaliation (Count VII); and failure to investigate and remediate harassment (Count VIII).  Id.  IBM has now moved for summary judgment.  D. 73.  Subsequently, IBM also moved to

strike certain portions of Tuvell's affidavit in opposition to IBM's motion for summary judgment, as well as several exhibits submitted by Tuvell.  D. 89.[3]  The Court heard the parties on the pending motions and took these matters under advisement.  D. 92.

## V.     Discussion

To survive IBM's motion for summary judgment, Tuvell "must initially present a prima facie case of employment discrimination."  Rennie v. United Parcel Serv., 139 F. Supp. 2d 159, 164 (D. Mass. 2001) (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1134–35 (8th Cir. 1999)) (internal quotation marks omitted).  "The general rule is that 'no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'"  Id. (quoting 42 U.S.C. § 12112(a)).  In this area "[t]here are two general types of employment discrimination claims – claims involving discriminatory discharge and claims concerning the failure to reasonably accommodate a disability."  Id.  Tuvell raises both types of claims.

### A.     Accommodation Claims (Counts I-V)

To prove a reasonable accommodation claim under both the ADA and Chapter 151B,[4]

---

[3] The Court did not rely on the contested portions of Tuvell's affidavit, D. 84, Exh. 47, or the challenged exhibits, D. 84, Exhs. 114-16, in considering this motion.  In light of the Court's conclusion here, however, the Court DENIES IBM's motion to strike, D. 89, as moot.

[4] The Court notes that "[f]or purposes of this lawsuit, analysis under the ADA and Chapter 151B is identical."  Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 n.2 (1st Cir. 2010); see also Sensing v. Outback Steakhouse of Florida, LLC, 575 F.3d 145, 153-54 (1st Cir. 2009) (explaining that "Chapter 151B is considered the Massachusetts analogue to the [ADA] . . . and noting that "[t]he [SJC] has indicated that federal case law construing the ADA should be followed in interpreting the Massachusetts disability law") (internal citations and quotation marks omitted)).  Moreover, the Court notes that "[a]lthough the ADA uses the term 'disability,'

Tuvell must show that:  (1) he suffers from a disability as defined by the ADA and Chapter 151B; (2) he was nevertheless able to perform the essential functions of his job, with or without reasonable accommodation, and (3) IBM knew of his disability but did not reasonably accommodate it upon his request.  Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 (1st Cir. 2010).  IBM focuses first on the second prong, arguing that Tuvell's accommodation claims (Counts I-V) must fail because Tuvell was not capable of performing the essential functions of his job, with or without a reasonable accommodation.  D. 75 at 4 and 6-7 (quoting Mass. Gen. L. c. 151B, § 1(16)).  "The employee bears the initial burden of producing some evidence that an accommodation that would allow him or her to perform the essential functions of the position would be possible, and therefore that he [] is a 'qualified [disabled] person.'"  Godfrey v. Globe Newspaper Co., Inc., 457 Mass. 113, 120 (2010).

### 1. Tuvell is Not a Qualified Disabled Person

The Court agrees with IBM that Tuvell has failed to demonstrate that he was capable of performing the essential functions required of his job, even with a reasonable accommodation. Tuvell argues that he was "medically able to perform work for IBM if he was provided the reasonable accommodation of a different supervisor, or a transfer to a new position away from Feldman." D. 85 at 9.  The record, however, belies such a contention.

Tuvell admits to submitting a number of MTRs, which characterized Tuvell as not "able to function at his job responsibilities," D. 76-38 at 1, and claimed that Tuvell was "totally disabled."  D. 82 ¶¶ 35, 41; see also Beal v. Bd. of Selectmen of Hingham, 419 Mass. 535, 543 (1995) (noting that where the plaintiff has claimed that they are unable to perform the duties of

---

and Chapter 151B uses the term 'handicap,' the statutory definitions are essentially the same" and the Court will "use the term 'disability' solely for consistency."  Faiola, 629 F.3d at 47.

the job to their employer "the plaintiff cannot now successfully claim that [they are] capable of performing the essential functions of the job").[5]  Moreover, these MTRs indicated that Tuvell generally suffered from "severe impairment in his ability to manage conflicts with others, get along well with others without behavioral extremes, and interact and actively participate in group activities."  D. 82 ¶ 33; see also id. ¶ 42, 44.  Tuvell's own treatment provider, Stephanie Ross, noted that "any contact with people from work" or, even "any discussion about work" could trigger Tuvell "into a state that involved hyper-reactivity, hyper-arousal."  Id. ¶ 45 (quoting Ross Depo., D. 76-7 at 11).  Ross stated that Tuvell had trouble speaking and would cry and shake when talking about work.  D. 76-7 at 10.  Tuvell could not "drive within a 50 mile radius – 20 mile radius of where he worked for a period of time without becoming hysterical."  D. 82 ¶ 52.  Ross was concerned for Tuvell's "mental health stability" and thought that just seeing Feldman or Knabe "could trigger his obsessive thoughts, depression, or other strong reactions."  Id. ¶ 46.

As such, Tuvell has not demonstrated that he would have been able to perform the essential functions of his job, even if IBM had assigned him to a different supervisor or transferred him to a new position.  See Bryant v. Caritas Norwood Hosp., 345 F. Supp. 2d 155, 166 (D. Mass. 2004) (noting that "[t]he ADA defines a 'qualified individual with a disability,'

---

[5] Tuvell relies on Sullivan v. Raytheon Co., 262 F.3d 41, 47 (1st Cir. 2001) and Labonte v. Hutchins & Wheeler, 424 Mass. 813, 819 (1997) for the proposition that employees may be considered qualified disabled individuals even if they have claimed total disability on  medical documents. D. 85 at 9.  In Sullivan, however, the First Circuit noted that although past claims of disability "do not necessarily preclude" a plaintiff's ability to argue subsequently that he is capable of performing his job with a reasonable accommodation, a plaintiff in that situation "must explain why the representations of total disability he has made in the past are consistent with his current claim that he could perform the essential functions of [his job] with reasonable accommodation."  Sullivan, 262 F.3d at 47.  And in Labonte, the Supreme Judicial Court's analysis turned on the fact that the plaintiff never actually claimed total disability, only stating that he was disabled without the reasonable accommodation.  Labonte, 424 Mass. at 818 (distinguishing from cases where the request for accommodations was made after the plaintiff had already admitted to being "totally disabled" and, thus, not a qualified handicapped person).

the members of the class it protects, as 'an individual with a disability who, <u>with or without reasonable accommodation,</u> can perform the essential functions of the employment position that such individual holds or desires'") (citation omitted) (emphasis in original)).   Even with a different supervisor, Tuvell would have had to enter the facility and have "contact with people from work."   D. 82 ¶ 45.   Indeed, Tuvell admits that even he "could not and did not identify anyone who could serve as his manager in place of [] Feldman."   D. 82 ¶ 51.   And a position transfer would not guarantee that Tuvell would never have to see, or hear about, Feldman again. Nor would Tuvell's proposed accommodations necessarily affect Tuvell's ability to get along with others "without behavioral extremes" or affect his ability to negotiate, compromise or manage conflicts with others.   <u>See</u> <u>id.</u> ¶ 48.   Nothing in the record demonstrates that Tuvell would have been able to successfully interact with groups or deal appropriately with criticism. Accordingly, the Court concludes that even with Tuvell's proffered reasonable accommodation – a different supervisor or a transfer to a new position – Tuvell has not demonstrated a genuine issue of material fact that he would have been capable of performing the essential functions of his job.

2.      *The Interactive Process and Reasonable Accommodations*

Next, IBM argues that, even assuming that Tuvell was a qualified handicapped person, Tuvell's claims fail because IBM did engage in an interactive process (Count I) and provided Tuvell with reasonable accommodations for his alleged disability (Counts III-V).  D. 75 at 4. IBM highlights that it permitted Tuvell "to take medical leave until such time as he was able to return to his position."  Id. at 8 (citation omitted).  Furthermore, IBM notes that, in addition to granting extended medical leave, IBM offered to allow Tuvell to receive his performance reviews from a different manager, while simultaneously affording him leave for medical appointments whenever necessary and the ability to continue looking for open positions.  Id. at 8-9.  In response, Tuvell argues that the "uncompensated leave" provided by IBM was "not a valid, effective or acceptable reasonable accommodation" and that any proposal that required to Tuvell to return to work below Feldman was unreasonable because it "was contrary to Tuvell's medical limitations."  D. 85 at 6.

As a threshold matter, the Court notes that having found that Tuvell was not a qualified disabled person, the Court need not reach the question of whether IBM provided him with a reasonable accommodation, as it was under no obligation to do so.  See Bryant, 345 F. Supp. 2d at 168.  Moreover, while "the ADA's interpretive regulations may require an employer to initiate an informal, interactive process with the individual seeking accommodation . . . there is no such requirement under Massachusetts law in chapter 151B."  Sullivan, 262 F.3d at 47-48 (internal citations and quotation marks omitted).   And even where IBM is required to engage in such a process, "an interactive process is not necessary where, as here, no reasonable trier of fact could [find] that the employee was capable of performing the job, with or without reasonable accommodation."  Id.

Nevertheless, the Court will address the parties' remaining accommodation arguments. First, IBM argues that it was Tuvell who refused to engage in an interactive process. D. 75 at 13. It is not disputed that Tuvell made a request for a specific accommodation, as he demanded a transfer to a new supervisor or to a new position. IBM argues, however, that Tuvell's behavior – "repeatedly demanding that IBM acquiesce to the only accommodation he would accept, while consistently refusing to consider any alternatives set forth by IBM" – does not amount to participation in an interactive process. Id. at 13-14. Indeed, "[b]oth parties, not just the employer, are required to engage in the reasonable accommodation process and to act in good faith." Rennie, 139 F. Supp. 2d at 168. The process is meant to be "cooperative" and an "appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." Id. (citation omitted).

Here, the record evidence shows that IBM attempted to engage in an interactive process with Tuvell. Although IBM indicated that it did not consider reassignment to another management team to be a reasonable accommodation, IBM indicated that it was open to other proposals for other possible accommodations. See e.g., D. 82 ¶¶ 18, 31. Despite IBM's demonstrated willingness to negotiate, Tuvell never made an alternate proposal.[6] Nevertheless,

---

[6] At the motion hearing, Tuvell seemed to suggest that he was able to successfully work from home and that IBM's failure to allow him system access while on short term disability leave was an attempt to deny him the reasonable accommodation of working remotely. See Feldman Email, Tuvell Exh. 111. Neither party, however, actually suggested this measure and, therefore, Tuvell cannot now ground his claim on IBM's failure to give him an accommodation that he never asked for absent evidence that his disability prevented him from properly requesting an accommodation or the accommodation was obvious. Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 & n.11 (1st Cir. 2007) (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001)) (noting that "the employer's duty to accommodate is triggered by a request from the employee" and "the plaintiff has the burden of showing that she 'sufficiently requested the accommodation in question'"). Moreover, even if Tuvell had been

IBM allowed Tuvell to remain on extended leave, encouraged him to continue to look for another IBM position through the GOM system and regularly reached out to Tuvell proposing different review and feedback procedures.  See e.g., id. ¶¶ 26, 31, 34, 55-57, 67, 71.  Indeed, on separate occasions, both IBM and Feldman offered Tuvell the opportunity to receive all feedback from a different manager and Metzger, Feldman's supervisor, reached out to Tuvell after Tuvell had exhausted his STD benefits offering to give Tuvell all his performance evaluations personally.  Id. ¶ 71.  Tuvell rejected these proposals.

In response, Tuvell contends that none of IBM's proposals were reasonable.  Specifically, Tuvell argues that none of the accommodations given, or offered, to him were reasonable because he was medically incapable of returning to work under Feldman and, therefore, the only possible reasonable accommodation was to receive a new supervisor[7] and/or transfer to a new department. D. 85 at 5-8.  Again, as discussed above, "a plaintiff must show that a proposed accommodation would enable [him] to perform the essential functions of [his] job."  Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001); Evans v. Fed. Express Corp., 133 F.3d 137, 140 (1st Cir. 1998) (noting that "[o]ne element in the reasonableness equation is the likelihood of success").  For the reasons already articulated, Tuvell has not shown that even his requested accommodation would have allowed him to perform his job.

In any case, the Court notes that the law requires only that "employers [] offer a reasonable accommodation, not necessarily the accommodation sought."  Bryant, 345 F. Supp. 2d at 169 (emphasis in original).  Indeed, the employer retains "the ultimate discretion to choose

---

offered the option of working remotely, he still may have reported to Feldman, or interacted with him.

[7] As noted above, Tuvell "could not and did not identify anyone who could serve as his manager in place of [] Feldman."  D. 82 ¶ 51.

between effective accommodations." Id. (citation omitted).  Contrary to Tuvell's arguments, IBM was under no obligation to, essentially, "find another job for an employee who is not qualified for the job he or she was doing." August v. Offices Unlimited, Inc., 981 F.2d 576, 581 n.4 (1st Cir. 1992) (quoting School Bd. of Nassau County v. Arline, 480 U.S. 273, 289 n.19 (1987)).  Rather, "[e]mployers are only required not to 'deny an employee alternative employment opportunities reasonably available under the employer's existing policies,'" id., and for "the position involved." Mass. Gen. L. c. 151B, § 4(16).  Here, IBM allowed an extended leave period and encouraged Tuvell to apply for any open positions in the company through the GMO system.  These are reasonable accommodations, and the ADA does not require IBM to transfer Tuvell or assign him to another supervisor.  See e.g., Weiler v. Household Fin. Corp., 101 F.3d 519, 526 (7th Cir. 1996) (noting that plaintiff's proposal to "work under a different supervisor" was the equivalent of asking to be able to "establish the conditions of her employment, most notably, who will supervise her" and explaining that such a "decision remains with the employer"); Wernick v. Fed. Reserve Bank of New York, 91 F.3d 379, 384 (2d Cir. 1996) (noting that "nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy. Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons").

Finally, Tuvell argues that IBM should have transferred him to the open position in Kime's group (Counts III-V).  See e.g., D. 85 at 11.  It is correct that the ADA does provide that a "reasonable accommodation may include . . . reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).  Here, however, Tuvell's admitted, serious impairments "getting along well with others without behavioral extremes, initiating social contacts, negotiation and compromise, and

interaction and active participation in group activities" indicates that even his desired transfer would not have been reasonable under the circumstances.  D. 82 ¶ 44; see also Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 202 (6th Cir. 2010) (holding proposed accommodation unreasonable where plaintiff failed to show how proposal would allow him to overcome a "key obstacle" to performing an essential function); Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 90 (1st Cir. 2012) (noting that "to show that a proposed accommodation is reasonable, a plaintiff must demonstrate that it would enable [him] to perform the essential functions of [his] job and would be feasible for the employer under the circumstances") (internal quotation marks omitted) (alteration in original)).  This is especially true given the  additional evidence in the record that "any contact with people from work, any discussion about work" and "going anywhere near the work facility" could trigger Tuvell "into a state that involved hyper-reactivity, hyper-arousal" and "obsessive thinking."  D. 82 ¶ 45.

Accordingly, the Court concludes that Tuvell has not rebutted IBM's showing that there is no genuine issue of material fact as to his failure to accommodate claims.

## B.    Discrimination Claims (Counts VI-VIII)

IBM next argues that Tuvell's discrimination claims must fail because he "has failed to make out a *prima facie* case of disability discrimination or provide any evidence demonstrating that the legitimate business reasons proffered by IBM are pretext for discrimination . . ."  D. 75 at 14.

To assess Tuvell's employment discrimination claims, the Court must apply the familiar burden-shifting framework.[8]  Sensing v. Outback Steakhouse of Florida, LLC, 575 F.3d 145, 154

---

[8] "The application of the McDonnell Douglas framework to claims of disability discrimination under the ADA was confirmed in Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999)."  Furtado v. Standard Parking Corp., 820 F. Supp. 2d 261, 270

(1st Cir. 2009) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)).  To establish a *prima facie* case of discrimination under the ADA and Chapter 151B, Tuvell must show that:  (1) he suffers from a disability; (2) he was nevertheless able to perform the essential functions of his job, with or without reasonable accommodation; and (3) his employer took an adverse employment action against him because of his disability.  <u>Faiola</u>, 629 F.3d at 47.  Tuvell has the initial burden of establishing a *prima facie* case.  <u>Beal</u>, 419 Mass. at 540.  If Tuvell establishes his *prima facie* case, "the burden then shifts to [IBM] to articulate a legitimate, non-discriminatory reason for [its] employment decision and to produce credible evidence to show that the reason advanced was the real reason."  <u>Sensing</u>, 575 F.3d at 154 (quoting <u>Tobin v. Liberty Mut. Ins. Co.</u>, 433 F.3d 100, 104 (1st Cir. 2005)).  If IBM offers "such a legitimate reason, the burden shifts back to [Tuvell] to produce evidence to establish that [IBM's] non-discriminatory justification is mere pretext, cloaking discriminatory animus."  <u>Id.</u>

### 1.   *Adverse Employment Actions*

For the reasons articulated above, the Court concludes that Tuvell cannot establish a *prima facie* case of disability discrimination as he was unable to perform the essential functions of his job.  Moreover, the Court concludes that the two adverse employment actions that Tuvell relies on – his failure to get a job in Kime's group and IBM's decision to terminate him – are not adverse actions taken because of his disability.  It is correct that termination "is not the only 'adverse employment action' that can satisfy this element."  <u>Sensing</u>, 575 F.3d at 157.  Indeed, "[p]revailing case law in the First Circuit and elsewhere supports a fairly liberal approach in determining what constitutes an adverse employment action."  <u>Rennie</u>, 139 F. Supp. 2d at 169.  Nevertheless, Tuvell must demonstrate that the allegedly adverse action had an effect "on

---

(D. Mass. 2011).

working terms, conditions, or privileges that are material . . . as opposed to those effects that are trivial and so not properly the subject of a discrimination action." Sensing, 575 F.3d at 160 (citation omitted). To begin, Tuvell's failure to receive the open position in Kime's group is not an adverse action, as his position with the company did not change. Tuvell remained employed in his current position and the objective terms and conditions of his employment – his salary, benefits, title and responsibilities – remained unchanged. Indeed, Tuvell did not experience any change in his employment until IBM terminated him in May 2012. D. 82 ¶ 79. Further, the record evidence does not show that IBM's decision to terminate Tuvell was motivated by a discriminatory animus.

### 2.    *Legitimate, Nondiscriminatory Reason for IBM's Employment Decision*

Because this Court concludes that Tuvell cannot establish a *prima facie* case of employment discrimination, IBM does not have to articulate a nondiscriminatory reason for its decision to terminate him. Beal, 419 Mass. at 545 n.6 (citing Sarni Original Dry Cleaners, Inc. v. Cooke, 388 Mass. 611, 614-15 (1983)). Nevertheless, IBM has offered a legitimate, nondiscriminatory reason for its decision to terminate Tuvell. In brief, IBM discovered that Tuvell had posted that he was working for an IBM competitor, EMC, while still employed by IBM. D. 82 ¶¶ 73-81. When IBM attempted to confirm that Tuvell was not, in fact, working for EMC, Tuvell refused to disclose his new employer. Id. As a result, IBM terminated Tuvell's employment.

This brings the Court to the final step in the burden-shifting framework. Here, Tuvell must present evidence to rebut IBM's explanation. He has not done so. To survive summary judgment, Tuvell must present specific, admissible evidence to create a genuine issue as to "show that the adverse employment action was [actually] the result of discriminatory animus."

<u>Che v. Mass. Bay Transp. Auth.</u>, 342 F.3d 31, 39 (1st Cir. 2003).  While "there is no mechanical formula for finding pretext," it can be demonstrated "by showing that the employer's proffered explanation is unworthy of credence."  <u>Id.</u> (citation omitted).  Tuvell argues only that because: (1) he "authorized" IBM to contact EMC to confirm that he was not employed there; (2) he feared "a retaliatory response" if he actually did tell IBM where he was working and; (3) he offered to tell an (unidentified) third-party where he was working who could then confirm with IBM that he was not working for a competitor – that he had completely "neutralized" IBM's concerns.  D. 85 at 19-20.  Tuvell asserts, therefore, that there is a sufficient inference of "discriminatory or retaliatory motive."  <u>Id.</u>  Notably, Tuvell does not dispute:  (1) that he posted online that he was working for an IBM competitor; (2) that IBM contacted him to confirm whether he was working for a competitor; (3) that IBM repeatedly asked him to confirm where he was working while still employed by the company; and (4) that he refused.  As such, Tuvell's arguments are insufficient to rebut IBM's legitimate, nondiscriminatory explanation for Tuvell's termination.  The record shows that, on March 12, 2012, Tuvell had indeed started working for the software company Imprivata while still on medical leave from IBM.  D. 82 ¶ 73.

> ### 3.      *Other "Tangible Acts"*

Finally, Tuvell raises a number of other "tangible acts" (Counts VI-VII) that he contends constitute adverse employment actions.  Specifically:  (1) the curtailment of his access to IBM facilities, computer networks and email while he was out on medical leave; (2) the August 2011 formal warning letter Tuvell received regarding his communication with colleagues; (3) his reassignment within his own group; (4) refusing to process and finalize his internal complaint; and (5) treating his work from home days as sick days.  D. 85 at 3-5.

To show an adverse employment action, however, "[t]here must be real harm; subjective feelings of disappointment and disillusionment will not suffice." King v. City of Boston, 71 Mass. App. Ct. 460, 468 (2008) (internal quotation marks omitted) (citing MacCormack v. Boston Edison Co., 423 Mass. 652, 664 (1996)). The "action must materially change the conditions of plaintiffs' employ." Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir.2002). Here, Tuvell's access to facilities and computer networks was only limited while he was out on leave and reportedly totally incapacitated to work. See e.g., D. 82 ¶ 35. As such, there was no "real harm" in limiting his access while he was not working. King, 71 Mass. App. Ct. at 468. Furthermore, the formal warning letter did not have any effect on Tuvell's pay, benefits, title or any other term or condition of employment. Nor did his inter-group transfer result in any change to Tuvell's pay or his rank within the company. In addition, Tuvell has presented no evidence to support the allegation that IBM did not process his complaint; in fact, it is undisputed that two investigations were conducted into Tuvell's allegations (Due's and Mandel's). D. 82 ¶¶ 17, 29. And finally, Tuvell's work from home days were only treated as sick days after Tuvell had advised IBM that he was "totally disabled" and unable to work. Tuvell, therefore, did not need work from home days while he was not working.

### 4. Hostile Work Environment

Tuvell also alleges that the "tangible acts," discussed above, created a hostile work environment "on the basis of his handicap, retaliation, race, gender [and] age" (Count VII). D. 10 at 28-29. To prove a hostile work environment claim, Tuvell must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Andujar v. Nortel Networks, Inc., 400 F. Supp. 2d 306, 329 (D. Mass. 2005)

(citation omitted).  "The work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that [Tuvell] in fact did perceive to be so."  Id. (citing Conto v. Concord Hosp., Inc., 265 F.3d 79, 82 (1st Cir.2001)).  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  Here, Tuvell found these incidents subjectively offensive.  Without diminishing his subjective belief, however, Tuvell's complained of "tangible acts" represent regular business practices and policies (i.e., treating medical leave days while "totally disabled" as sick days or switching employees on projects within the same group) and relatively standard workplace interactions and criticisms.  As such, the Court concludes that Tuvell's allegations do not approach the level of severe or pervasive conduct that would be objectively offensive.  Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) (noting that the "workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins – thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world").

In sum, the Court concludes that Tuvell has not rebutted IBM's showing that there is no genuine issue of material fact as to his disability discrimination claims. [9]

---

[9] Tuvell's failure to investigate claim (Count VIII) is likewise dismissed.  Tuvell's claim that IBM's alleged failure to investigate gave rise to a hostile work environment has been addressed above.  To the extent that Tuvell also seeks to argue that IBM's alleged failure to investigate gives rise to an independent cause of action under Massachusetts law, see D. 85 at 23, the Court notes that no independent claim of failure to investigate exists absent underlying proof of discrimination.  Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 13 (1st Cir. 2001).

### C.      Retaliation Claims (Counts V-VIII)

Having determined that Tuvell cannot sustain his accommodation and discrimination claims, the Court will address briefly his retaliation claims (Counts V-VIII), which are based on the same conduct described in detail above.  To succeed on his retaliation claim, Tuvell must prove that:  (1) he was "engaged in protected conduct;" (2) "suffered an adverse employment action; and (3) [that] there was a causal connection between the protected conduct and the adverse action." Jones v. Walgreen Co., 679 F.3d 9, 21 n.7 (1st Cir. 2012) (citing Colón–Fontánez v. Municipality of San Juan, 660 F.3d 17, 36 (1st Cir. 2011)) (alteration in original).  If Tuvell establishes a *prima facie* case of retaliation, then the burden shifts to IBM "to articulate a legitimate, nondiscriminatory [or nonretaliatory] reason for its employment decision." Id. at 20 (citation omitted) (alteration in original).  If IBM meets this burden, then Tuvell must show that the offered reason is pretextual. Id.  Under both Massachusetts and federal law, the success of Tuvell's retaliation claims does not depend on the success of his disability claims. Id. (noting that "[f]ederal and Massachusetts law are in harmony on this issue").  As discussed in detail above, however, the pre-termination actions complained of by Tuvell are not adverse employment actions.  Furthermore, IBM has offered a legitimate, nonretaliatory reason for terminating Tuvell's employment, and Tuvell has offered no admissible evidence to rebut IBM's proffered explanation.  Accordingly, the Court concludes that Tuvell's retaliation claims are without merit.

### D.      Age, Gender and Race Discrimination Claims (Counts V-VIII)

Finally, the Court notes that Tuvell has offered no facts to support his discrimination claims based on age, gender and race.  Tuvell has alleged no facts, distinct from those addressed elsewhere, to sustain a discrimination claim on the basis on age, gender or race.  Tuvell appears to argue that his transfer within his group, switching projects with Mizar – who is Asian, female and younger – may have constituted discrimination.  Tuvell offers no support for this opinion, however, stating only that it constituted discrimination because "something bigger" was "at play" that "had to be illegal." D. 82 ¶ 11 (quoting Tuvell Dep., D. 76-2 at 7).  This allegation, standing alone, is not enough to rebut IBM's showing that there is no genuine issue of material fact as to his age, gender and race discrimination claims.  Moreover, as discussed above, Tuvell acknowledges that this switching of projects did not result in any change to Tuvell's pay, title or rank within the company.  Accordingly, the Court concludes that there is no genuine issue of material fact as to Tuvell's remaining discrimination claims.

## VI.        Conclusion

For the foregoing reasons, the Court ALLOWS IBM's motion for summary judgment, D. 73.  In addition, the Court DENIES IBM's motion to strike, D. 89, as moot.


**So Ordered.**

/s/ Denise J. Casper
United States District Judge